J. J. Little & Ives Co., Inc. v. Commissioner.
J. J. Little & Ives Co. v. Commissioner
Docket No. 90574.
United States Tax Court
T.C. Memo 1966-68; 1966 Tax Ct. Memo LEXIS 214; 25 T.C.M. (CCH) 372; T.C.M. (RIA) 66068; March 31, 1966
*214 Held: (1) Contracts in the taxable years between petitioner and merchants relating to books published by petitioner were contracts of sale, known as "sale or return" contracts, and not consignment contracts. (2) Sec. 1.451-3, Income Tax Regulations, permitting reporting income from construction contracts in year of completion of contract does not apply to petitioner; petitioner cannot report income from sales of books under a completed contract, or completed deal, method. (3) No provision of the 1954 Code, or the regulations, permits petitioner to deduct an amount for a reserve for anticipated returns of books by merchants. (4) Under rule requiring a method of accounting and reporting income on basis of a fixed annual period, petitioner cannot compute amount of deduction for refunds for books returned by merchants on basis of actual returns in period of from 18 to 20 months, as petitioner did by keeping books open, filing late tax returns, and reducing taxable income by so-called year-end adjusting entries in accounting records. (5) Petitioner cannot keep its accounts under one method and file its returns under another method, but must compute taxable income under the method of accounting *215 on the basis of which it regularly computes its income in keeping its books. Sec. 446(a), 1954 Code. Samuel Byer, for the petitioner. Rudolph J. Korbel, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined deficiencies in income tax for the years 1954-1956, inclusive, as follows: 1954
$ 53,061.07
1955
516,930.96
1956
82,373.75 Petitioner, in the taxable years, engaged in a business of selling books under a particular type of sales promotion plan involving supermarket chain store corporations which offered the books for sale to the public in their stores, with the right to return unsold books to petitioner. Petitioner reports income under an accrual method of accounting on the basis of the calendar year. The problem for each taxable year is to determine the amount of the taxable income which accrued to petitioner for each year, which depends on whether petitioner sold books to merchants under a "sale or return" contract, or delivered them on consignment. Findings of Fact The stipulated facts are so found, and are incorporated herein by reference. Petitioner filed its returns for the taxable year with the district director of internal revenue *216 for the Upper Manhattan district of New York City. Petitioner keeps its books and makes its tax returns on the basis of the calendar year, under an accrual method of accounting. Petitioner's office is in New York City. Petitioner was organized under New York laws on July 5, 1946, but it was an inactive corporation until 1954 when it entered into a business of selling books under a particular plan, which was carried on until the end of 1960 when this type of business ended. The business consisted of selling general reference books, one volume at a time. The books were printed for petitioner under its direction, and under this arrangement, petitioner was a publisher. However, the chief part of petitioner's business was selling the books under a book-sale promotion plan in large quantities in mass-consumer markets, as follows: Petitioner dealt with corporations which operated chain food stores, supermarkets, with a few wholesale firms that supplied merchandise to food stores, and others. Among the chain store corporations were Colonial Stores, having headquarters in Atlanta, Georgia, which operated 450 supermarket food stores in 7 states in the southeastern section of the United States; *217 Food Fair, American Stores Stop and Shop, First National, Grand Union, Klein Super Markets, Rosauer's Supermarkets, Food Banks, Great Scott Food Markets, Schaffer Stores, Fitzsimmons Stores, Gristede Brothers, and the Giant Markets. The various chain store corporations operated supermarkets in different sections, areas, and cities of the United States such as, for example, in the New York City area; Pennsylvania; California; Rhode Island; Minnesota; Colorado; upstate New York; the state of Washington; and in other states. The books distributed by petitioner were displayed and offered for sale in the stores of the chain store corporations during a short sales-promotion period of time. By dealing with chain store corporations, petitioner obtained a nation-wide distribution of the books in the mass markets to which the various chains of stores catered. The nature of a book promotion, in a particular area at a time, and the arrangements with a chain store corporation are described hereafter. Two of the chief features of the arrangements and a promotion were that petitioner shipped large quantities of books to a chain store warehouse for distribution to the stores where a promotion was *218 to take place, and the unsold books were to be returned to petitioner who later used such books in another book promotion in a different locality. The reference books that petitioner distributed during the years 1954 through 1960 were published in sets consisting of several numbered volumes. One title would comprise 12 volumes; another title, 18 volumes; another title, 20 volumes. Among the titles were the following: New Pictorial Encyclopedia of the World, 18 volumes; 20th Century Encyclopedia, 20 volumes; Popular Mechanics Do-It-Yourself Encyclopedia, 12 volumes; Junior Classics, 12 volumes; Little & Ives Family Health Encyclopedia, 12 volumes. Although the various titles were published in sets, petitioner's sales plan did not consist of or require selling only a complete set of the books. That is to say, a prospective purchaser did not have to agree to purchase all of the volumes constituting the complete set of books, and the complete set of books was not offered as a unit at the beginning of a sales promotion in a supermarket store. During the course of a sales promotion of a single title of books, such as New Pictorial Encyclopedia of the World (NPEOW), each of the numbered volumes *219 was offered for sale in a store one volume at a time on the continuity basis, one different volume per week in consecutive order, volume 1 through the series, and the public was free to purchase some or all of the consecutive volumes in the series. In actuality, some individual purchasers would purchase several consecutive volumes in the set but would not purchase all of the volumes in the set. Petitioner's experts in the marketing of books expected such reactions among the individuals who patronized the supermarket stores. It was anticipated by petitioner and the chain store corporations that there would be a "fatigue factor" in public interest during the course of the volume-per-week promotion which would result in the noncompletion of an individual's possible intention, at first, to purchase every volume in a set on a volume-per-week basis. On the other hand, there were individuals who stayed with the promotion and purchased every consecutive volume in a particular set, or title. However, many would purchase only the first 3 or 4 consecutive volumes and then would stop. Only one title, such as NPEOW, would be offered during a sales promotion in a store, and that store would have *220 the exclusive offering of that title in the locality. When the sales promotion of one title ended in a locality, the books were removed, the unsold books were returned to petitioner, and petitioner would not have a book promotion again in that locality for a substantial length of time thereafter, perhaps not for 2 years, or longer. At the end of a promotion of a title in a locality, petitioner would arrange for a promotion of the same title in another locality. The number of weeks of a single promotion of a title in one locality was the same as the number of consecutive volumes in the title, such as 18 weeks in the case of NPEOW, plus 2 or 3 additional weeks to afford those purchasers who desired to purchase the complete set of books the opportunity of buying the numbered volumes required for filling in the set. During the course of the promotion of an 18-volume title in a locality, the supermarket store would put on display in the store volume 1 at the beginning of the first week; volume 2 at the beginning of the second week; volume 3, the next week; and so on, and the last volume, the last week. Petitioner made shipments of various quantities of each consecutive volume on a weekly *221 basis. After each new volume was placed in a store for sale to the public, a supply thereof remained on sale in the store. For example, at the beginning of the sixth week of the promotion, volumes 1 through 6 were on display in the store; then, volumes 1 through 7, and so on, each week, until all 18 consecutive volumes were on racks in the store and available to the public at the beginning of the 18th week and for a short time thereafter (during a clean-up period), after which all of the unsold volumes of the title were removed from the store and returned to petitioner. During the promotion period some of the unsold volumes might be returned to petitioner. As between petitioner and the supermarket stores where a sales promotion of a title was to take place, the understanding was at the outset that for each consecutive volume in the series, 18 volumes, for example, the quantity to be shipped by petitioner of each numbered volume would be the largest for volume 1, and that the quantity of each succeeding volume would be on a diminishing scale, according to a formula of petitioner as applicable to the particular stores involved. The chain store corporation was obliged to submit to petitioner *222 weekly reports showing the sales made at each store in the participating group of stores, as well as the number of volumes on hand at each store; and the reports were to be submitted to petitioner within 10 days from the date when each numbered volume in the series was placed on sale, and on each tenth day thereafter during the term of the promotion. Petitioner determined from these reports on actual sales, and from its formula, the quantity of each succeeding volume in the series to be shipped to the chain stores. Therefore, petitioner determined the quantity of each numbered volume after the first 2 or 3 volumes in the series that were to be shipped and were shipped to the stores. The form used usually by petitioner and a chain store corporation in entering into a book promotion arrangement had the caption, "Book Order Form", on which were typed various details including the quantity of each numbered volume to be shipped by petitioner, but ordinarily the parties left blank the item of quantity of each numbered volume to be shipped after the first 2 or 3 numbered volumes, and there was written in "balance as per reports", or "balance of books to be shipped as per book formula", leaving *223 the matter of the quantity to be shipped of each consecutive volume within petitioner's judgment; and it was stated on the book order form that petitioner reserved the right "to ship the amount of books which in its opinion is adequate to supply the requirements of merchant." Petitioner took into account the weekly reports of the sales of the books by the stores and the diminishing consumer interest and demand that was expected and was indicated by the reports. In order to stimulate consumer interest, petitioner required that volume 1 in a series should be sold at a nominal price, fixed by petitioner, usually 25 cents, and the stores were to remit to petitioner the same amount, 25 cents, thereby making nothing from the sales of volume 1. Petitioner fixed the retail price at which all of the succeeding volumes of the series were to be sold by the stores to the public. In the case of NPEOW the retail price was 99 cents per volume, of which the stores were to remit to petitioner 82 cents for each volume sold, retaining 17 cents per volume. Generally, for most of the titles, the retail price fixed by petitioner was 99 cents per volume for all except volume 1, of which 82 cents per volume *224 sold was paid to petitioner. In each promotion and for each title involved petitioner determined the amount of the retail price to be charged by the stores and the stores could not sell the books to the public at any other price. As a further stimulation of the sale promotion, petitioner paid the chain store corporation an advertising allowance of 3 cents per volume actually sold, except on volume 1. Usually the advertising allowance was credited on petitioner's books to the stores. Often, petitioner guaranteed a minimum advertising allowance, such as $2,000, or more. In some instances, petitioner supplied the newspaper mats for advertisements. Petitioner required the stores to carry on an advertising campaign in newspapers, and sometimes on radio and television, at the start of and during the promotion campaign. The agreed advertising allowance paid by petitioner depended upon the merchant's submission of evidence of actual advertising expense incurred or paid accompanied by the advertising copy used and the invoices for advertising to the merchant. Petitioner supplied to the chain store corporation for use in its stores, free of charge, point-of-sale materials such as racks for *225 displaying the books, inserts, throw-aways, banners, and other in-store promotion material. Petitioner fixed and determined the period of time within which the books were to be offered for sale to the public by the stores. At the end of this period (at the latest), the stores sent all of the unsold volumes to the warehouse of the corporation for shipment back to petitioner's warehouse. Sometimes, some of the unsold volumes would be returned to petitioner during the promotion period. At the corporation's warehouse, the books were sorted and counted on the basis of each separate volume number (volume 1, volume 2, and so on), and were packed in cartons, each carton being marked to show the numbered volume enclosed. The warehouse of the chain store corporation took several weeks to sort, count, repack, and ship the unsold books to petitioner. On the book order form it was provided that the merchant would return to petitioner all of the unsold volumes in good condition not later than 90 days from the on-sale date, and petitioner required compliance with this provision as far as possible. It was to petitioner's advantage to receive all of the unsold books as soon as possible for use in the *226 next promotion campaign. In practice, the chain store warehouse often took one or two months from the end of the promotion to return books to petitioner. The quantities of unsold books which were returned to petitioner were substantial. Upon receiving the returned books, petitioner inspected and repackaged them and held them in its inventory prior to using them in the next sales promotion with another chain store company. The merchant shipped the unsold books to petitioner at its own expense. The merchant received full credit for the returned books, less the advertising allowance paid by petitioner for each book actually sold. The merchant had the right to return only books "in good condition", and could not return damaged books. During a calendar year, petitioner shipped books to merchants and, also, received shipments of unsold books returned by merchants. A substantial quantity of the books shipped by petitioner during a calendar year were not returned by merchants to petitioner until after the end of the year in which petitioner had shipped the books. Since the merchants were to return unsold books, petitioner anticipated at the end of a calendar year that there would be returns *227 of books after the close of the year out of books shipped during the year. The parties have stipulated that after the end of 1954 books shipped by petitioner during 1954 were returned in the amount of $80,206; that out of the total amount of books shipped during 1955, the books returned after the end of 1955 amounted to $880,806; that out of all shipped in 1956, the books returned after the close of 1956 amounted to $1,689,763; and that out of all shipped in 1957, the books returned after the end of 1957 amounted to $1,286,545. In the instances of particular sales-promotions of books which began in the latter part of a year or ended close to that time, the returns of unsold books by the chain store corporations of books shipped by petitioner during the year could not be completed before the end of the year. Moreover, the merchants were unable in many cases to make the returns promptly. At the end of a book promotion in the stores of a chain store corporation, a final accounting of the entire promotion by the merchant was made to petitioner, at the time all of the unsold books were and had been returned to petitioner, showing the amounts of books received, sold, and returned. It was *228 provided in the typical book order agreement with each merchant-dealer that the terms of payment were "net 10 days from invoice date, freight prepaid." Petitioner sent an invoice to the merchant-dealer with each shipment of books. In subsidiary ledgers, petitioner maintained an account for each title of books dealt in during the year (NPEOW, 20th Century, etc.) entitled "Sales", and another account for each title of books entitled "Accounts Receivable." Entries were made in these accounts for each invoice crediting the "Sales" account, and debiting "Accounts Receivable". Cash payments of the invoices were credited as cash to "Accounts Receivable". When books were returned to petitioner, the amount thereof was debited as returns to "Sales", and were credited as returns to "Accounts Receivable" (with notations that the entries represented returned books). At the end of each month, the entries in the accounts were totaled and the total amounts were posted in the general ledger in the respective accounts entitled "Sales" and "Accounts Receivable" relating to the book title involved. Under some of the book order agreements, petitioner guaranteed and paid in advance to the merchant a minimum *229 amount of profit such as, for example, 17 cents per volume for the sale of the first 58,823 volumes, or $10,000. The following provision in a 1955 book order agreement for NPEOW with a chain store corporation illustrates such prepayment of a minimum profit: Publisher agrees that the minimum profit on volumes two through eighteen (we are excluding volume one) shall be $10,000 based on 17" per book gross profit. In view of the fact that we are prepaying this profit to you prior to promotion, it is understood that the first 58,823 copies of volumes 2 through 18 will be billed to you at 99" each [rather than 82 cents each]. Publisher agrees to pay this $10,000 minimum guarantee prior to the merchants' starting this campaign. Under the terms of the book order, the merchant assumed "all the risks of loss or damage to books in its possession" and was not entitled to any refund or allowance for lost or damaged books; and the merchant agreed to assume and pay all federal, state, city, or local taxes, if any. The merchant also assumed all responsibility "for demurrage and storage charges at destination." Petitioner insisted, as far as possible, upon the merchant's compliance with the provisions *230 in the book order agreement, particularly with the requirement that the merchant would return all unsold books to petitioner not later than 90 days from the onsale date. The following is a typical book-order agreement used by petitioner and the merchants during the years 1954 through 1956; the agreement usually was one sheet of paper having the terms and provisions set forth on the top-side and the reverse side thereof: [Top-Side of Agreement]
BOOK ORDER FORM
To:
J. J. Little-Ives Co., Inc.
Title:
New Pictorial Encyclopedia of the World
From:
Schaffer Stores Co., Inc.
Date:
Oct. 3, 1955.
116 Erie Blvd.,
Ship Via:
Cheapest way.
Schenectady, N. Y.
When:
Approx. Nov. 15, 1955.
Terms:
Net 10 Days From Invoice Date - Freight Prepaid
Requested
Shipping
Unit
Total
Retail
Vol. #
Quantity
Date
Price
Price
Price
1
10,000 to 12,000
25" each
25" each
2
6,000 to 7,500
82" each
99" each
3
5,400 to 6,000
82" each
99" each
4
5,000 to 5,500
82" each
99" each
Balance as Per
(all at 99" each)
Reports See Reverse Side For Further Terms Which Are Part Of This Order. (signed), Little & Ives Co. (signed) Schaffer Stores Co. [Reverse Side of Agreement] TERMS OF ORDER 1. PUBLISHER agrees to grant MERCHANT an advertising allowance of 3" for each book actually *231 sold by MERCHANT, except on Volume I, which allowance will be paid or credited by PUBLISHER upon proof furnished by MERCHANT to PUBLISHER that such advertising expense has actually been incurred or paid, accompanied by copies of the invoices to MERCHANT for, and of, the advertising copy utilized, all advertising shall be at the MERCHANT'S best local rate. 2. PUBLISHER will supply reasonable amounts of point-of-sale material such as racks, inserts, throw-aways, etc., free of charge, F.O.B. New York City. 3. MERCHANT assumes all the risks of loss or damage to books in its possession and shall not be entitled to any refund or allowance therefor. All federal, state, city, or local taxes, if any, shall be assumed and paid by the MERCHANT. MERCHANT assumes all responsibility for demurrage and storage charges at destination. 4. MERCHANT agrees to submit to PUBLISHER weekly reports covering the sale of books at each store listed in Exhibit "A" attached, as well as each store's inventory by Volume, which reports shall be submitted to PUBLISHER within ten (10) days from the date that each volume is placed on sale, and on each tenth day thereafter during the term of this agreement. 5. MERCHANT *232 shall be entitled to return to PUBLISHER, freight prepaid, at MERCHANT'S expense, for full credit less advertising allowance, all unsold volumes in good condition not later than 90 days from on-sale date. 6. PUBLISHER reserves right to ship amount of books which in its opinion is adequate to supply requirements of MERCHANT. 7. All of the foregoing is subject to fire, strikes, accidents, and other causes beyond PUBLISHER'S control. Petitioner's Bookkeeping and Accounting Records Petitioner had its internal bookkeeping department, and employed an accounting firm to perform auditing services and to prepare its income tax returns. Petitioner maintained subsidiary ledgers, a general ledger, and journals. As of the end of each calendar year, a series of adjusting entries were made in the general ledger after the end of the year. Petitioner obtained extensions of time for filing its federal income tax return for each of the taxable years. The tax returns for 1954, 1955, and 1956 were filed, respectively, on June 15, 1955, September 17, 1956, and September 16, 1957. The books of petitioner were kept open after the end of each year and the adjusting entries were made in various ledger accounts *233 in the following year prior to the time of filing the tax return, as of December 31 of the taxable year. Many of the adjusting entries reflected the returns of books after the end of the taxable year which were shipped during the taxable year. The following describes the accounts in the general ledger for 1954 and 1955. Petitioner's method of keeping its books in 1955 was essentially the same as in 1954; and its bookkeeping method in the years 1956-1960 was essentially the same as in 1955. References are made here, therefore, only to petitioner's bookkeeping method in 1954 and 1955, and to the year-end adjustments to various general ledger accounts in the respective general ledgers kept for those years. Later, references are made, separately, to the respective methods followed in the preparation of petitioner's tax returns for 1954 and 1955. All references are to the general ledger: The accounts in the general ledger included several separate accounts entitled "Sales" for each book title (20th Century, New Pictorial Encyclopedia, Do-It-Yourself, etc.); "Accounts Receivable"; and "Advertising Allowances to Customers." During the calendar year, entries were made in these general ledger *234 accounts, on a monthly basis, that were taken from the similar accounts in the subsidiary ledgers where the daily entries were made. Illustrative of the way these accounts were maintained are the following: Each shipment of books by petitioner to a merchant was entered as a credit in the account "Sales", for the title of the books shipped, and as a debit in the account, "Accounts Receivable" for the same title of books. Thus, the total shipments in February 1954 of 20th Century amounted to $126,621.24, which on February 28, 1954, was credited to "Sales" of that title and debited to "Accounts Receivable" for the same title. Debit entries were made each month in the account for "Sales" of the title in the amount of the total volumes returned to petitioner during the month. In the corresponding "Accounts Receivable", a credit entry was made for volumes returned to petitioner, and, also, credit entries were made for cash paid by merchants to petitioner. Thus, in March 1954, the returned volumes of 20th Century amounted to $14,418.12, which were debited to "Sales" and credited to "Accounts Receivable", and merchants paid petitioner cash for shipments of the same title of $48,393.24 and *235 $60,000, which were credited to "Accounts Receivable" for that title. Like entries were made in the general ledger in "Sales" of NPEOW and "Accounts Receivable" for the same title. Entries made in the several Sales and Accounts Receivable accounts each month, January through December, prior to any adjusting entries in the accounts made after December 31, as of that date, showed (1) shipments of books to merchants and actual returns of books by merchants during the calendar year in Sales accounts; and (2) in the several accounts for Accounts Receivable the shipments of books to merchants, cash paid by merchants, and actual returns of books by merchants during the calendar year. Petitioner's ledgers were kept on the same basis for the years 1955 through 1960. In general, petitioner's books were kept, under an accrual method of accounting so as to accrue as income the amount of the shipments of books as shipments were made during the year. However, after the close of the calendar year, year-end adjustments in various accounts were made as of December 31 on the basis of which petitioner's tax returns were prepared. The following sets forth for 1954, before the year-end adjustments, the *236 amounts according to petitioner's general ledger for 1954 of its income, expenses, and net income: According to Books Before Adjustments
Sales & other income (1)
$1,651,422.09
Less: Books returned in '54 (2)
251,623.29
Gross sales
$1,399,798.80
Less: Cost of goods sold (3)
852,377.92
Gross profit from sales
$ 547,420.88
Other income
10,859.96
Total income
$ 558,280.84
Expenses before year-end ad-
just. $5,000 advertising
$ 427,485.37
Net income per books before
adjustments
$ 130,795.47 The sales and other income accrued on petitioner's books during 1954, item 1, supra, were as follows: Books shipped, sales: 20th Century
$511,089.60
20th Century
123,852.62
$ 634,942.22
New Pictorial
961,103.67
$1,596,045.89
Other Sales & Income
Am. Int'l Encyclopedia
$ 18,046.60
Royalties, New Picto-
rial
37,329.60
55,376.20
Total accrued income
$1,651,422.09 The books returned to petitioner, item 2, supra, before the end of 1954 were: 20th Century
$166,361.17
20th Century
28,072.14
$ 194,433.31
New Pictorial
57,189.98
Total returns in '54
$ 251,623.29 The cost of goods sold, item 3 supra, was: Merchandise purchases
$ 400,274.26
Other costs
674,441.37
$1,074,715.63
Less: Ending inventory, books on
hand
222,337.71
Cost of goods sold
$ 852,377.92
Since petitioner's *237 tax returns for 1954 was not filed until June 1956, petitioner made adjustments in various general ledger accounts and entries in additional accounts after the end of 1954; they were made as of December 31, 1954; and the 1954 tax return was prepared on the basis of the adjustments. The adjustments served to decrease petitioner's net income by $95,440.53, from $130,795.47 to $35,354.94. Petitioner's 1954 income tax return reported adjusted figures for gross sales, cost of goods sold, gross profit from sales, expenses, and taxable income, as shown below. The adjustments are explained hereinafter. The 1954 return reported the following amounts: 1954 Income Tax Return
Gross sales (1)
$1,237,706.79
Less: Cost of goods sold (2)
780,726.44
Gross profit from sales
$ 456,980.35
Other income
10,859.96
Total income
$ 467,840.31
Deductions (3)
432,485.37
Taxable income
$ 35,354.94 Explanation of adjustments: Item (1), supra: During January and February of 1955, out of books shipped during 1954, there were actual returns of books by merchants in the amount of $80,205.57 (New Pictorial, $64,588.65; 20th Century, $15,616.92). In June 1955, adjustments were made in the general ledger, as of December 31, 1954, which *238 had the effect of reducing petitioner's gross sales shipments in 1954 by $80,205.57. Also, in June 1955, an adjustment was made in the general ledger, as of December 31, 1954, of $81,886.44 which had the effect of also reducing petitioner's gross sales (shipments) in 1954 by $81,886.44. These 2 adjustments in the total amount of $162,092.01, reduced petitioner's gross sales in 1954 to $1,237,706.79, on its 1954 tax return, from $1,399,798.80, the amount of gross sales shown by its books at the end of 1954 prior to the yearend adjustments made in 1955. Item (2), supra: In June 1955, as of December 31, 1954, in a new general ledger account called "Inventory", there were 2 adjusting entries made of $33,442.64 and $38,208.84, or a total $71,651.48, which increased the inventory of books at the end of the year from $222,337.71 to $293,989.19. On petitioner's tax return for 1954, in Schedule A, Cost of Goods Sold, the increase in the figure for inventory at the end of the year had the effect of reducing cost of goods sold from $852,377.92 to $780,726.44, but since the figure for gross sales had been reduced, all of these adjustments served to reduce gross profit from sales from the book *239 figure before adjustments of $547,420.88 to $456,980.35, as follows, on the tax return: Gross sales
$1,237,706.79
Less: Cost of goods sold
780,726.44
Gross profit from sales
$ 456,980.35
Item (3), supra: Another adjustment made in June 1955, as of the end of 1954, increased the general ledger account "Advertising Allowances to Customers, New Pictorial Encyclopedia" by $5,000, which increased petitioner's expenses on its books before adjustments in the same amount, from $427,485.37 to $432,485.37, the latter figure being the total amount of the deductions on the 1954 tax return. Further explanation of the adjustments in the general ledger as of December 31, 1954, made in June 1955: The account for 1954 "Sales - New Pictorial Encyclopedia" was reduced, debited, by $81,886.44; and the account for "Advertising Allowances to Customers - New Pictorial Encyclopedia" was debited $5,000. These 2 debits of $86,886.44 were accompanied by 2 credits, (in the same total sum) of $69,265.87 in "Accounts Receivable, New Pictorial [etc.] (which decreased accounts receivable), and of $17,620.57 in an account, "Customers Credit Balances." The journal entry explains the adjustments as removing from sales and *240 accounts receivable unpaid shipments at December 31, 1954, and to show liability for advertising and sundry credits to customers. (With respect to the adjustment reducing 1954 sales by $81,886.44, petitioner's contention is that at the end of 1954, there were consignments out of that amount for which payment had not been received at the end of 1954.) Corresponding adjusting entries were made for books out in the hands of merchants, $81,886.44, representing 87,063 volumes shipped in 1954 on the basis of petitioner's cost; the inventory account was increased (debited) by $33,442.64, and Profit and Loss was credited in the same amount. In determining the income tax deficiency for 1954, respondent concluded that petitioner, on an accrual basis of reporting income, was in error in making the year-end adjustment of $86,886.44 and the related adjustments in accounts receivable, dealer's credit balances, and inventory. He determined that petitioner's shipments of books in 1954 constituted sales at the time of shipment from which income then accrued. The respondent's adjustment to increase petitioner's accrued income from shipments in 1954 of the 87,063 volumes of books involved was to increase *241 petitioner's accrued income for 1954 by $53,443.80, the difference between $86,886.44 and $33,442.64. His explanation in the deficiency notice is to the following effect: It has been determined that the shipments of books to your customers constitute sales to them at the time of shipment. The amount of $53,443.80 was eliminated by you from income for the year 1954 by a charge to sales of $86,886.44 and by credits to sundry expense accounts in the total amount of $33,442.64. In the balance sheet at the end of 1954, these adjustments are reflected by an increase in the inventory of alleged consigned books in the amount of $33,442.64 and a decrease in accounts receivable of $69,265.87 plus customers' credit balances of $17,620.57. Respondent's explanation includes the following: Apparently, the above amounts were eliminated by you on the ground that they represent unrealized profits on uncompleted sales for books allegedly shipped on consignment. Since it has been determined that the shipments of books represent sales and not consignments, the respective amounts are restored to taxable income. Accordingly, the income for the taxable years 1954, 1955 and 1956 have been increased in the *242 respective amounts of $53,443.80, $824,922.62 and $503,947.41. The other year-end adjusting entries made by petitioner of $80,205.57, with the related bookkeeping entries, consisted of the following: An account was set up in the general ledger, "Reserve for Accounts Receivable - Anticipated Returns", which was debited as of the end of 1954 with $80,205.57, "To set up a reserve for returns actually made during the period 1/1/55-2/28/55." Another new account was set up in the general ledger, "Anticipated Sales Returns", which was debited in June 1955, as of December 31, 1954, in the amount of $64,588.65 for New Pictorial, and $15,616.92 for 20th Century, total $80,205.57. Also, in connection therewith the new adjustment account, "Inventory", was debited $38,208.84, to record as inventory anticipated returns in January and February 1955 of $34,134.44, New Pictorial, and $4,074.40, 20th Century; and "Profit and Loss" was credited $38,208.84. In determining the deficiency for 1954, respondent recognized that the above adjustments had the effect of reducing taxable income by $41,996.73, the difference between the charge of $80,205.57 to "Anticipated Returns" and the increase of "Inventory" *243 by $38,208.84. His explanation is as follows: The amount [$41,996.73] is in effect a reserve for anticipated returns and is the difference between the amount of anticipated returns at the end of the year less the amount taken into inventory at the end of the year. The amount of $41,996.73 is disallowed for the reason that it does not represent a deductible item under any provision of the Internal Revenue Code of 1954. Petitioner's Year-End Adjustments for 1955 During 1955, the titles of books sold by petitioner continued to be 20th Century Encyclopedia of the World and New Pictorial Encyclopedia, and in addition petitioner made sales of Popular Mechanics Do-It-Yourself Encyclopedia published in a 12-volume set, hereinafter called Do-It. Petitioner's books were kept in essentially the same way as in 1954; there were ledger accounts, "Sales", with separate columns for each of the different titles of books, in which shipments were credited and books returned were debited; and "Accounts Receivable" for each title of books. According to entries in the various general ledger accounts made during 1955, before year-end adjustments made as late as September 1956, but as of December 31, 1955, *244 petitioner's sales from shipments of books, the actual returns of books during 1955, and other items were as follows: According to 1955 Books Before Adjustments
Gross sales per shipments
$8,108,088.16
Less: Actual returns in 1955
1,171,745.68
Gross sales
6,936,342.48
Less: Cost of goods sold (1)
3,811,783.69
Gross profit from sales
$3,124,558.79
Other income
44,043.56
Total income
$3,168,602.35
Expenses before adjs.
1,795,979.01
Net book income before adjs.
$1,372,623.34 Cost of goods sold, in the above schedule (1), $3,811,783.69, represented the following items: Inventory, Jan. 1, 1955
Materials
$ 42,962.44
Books
251,026.75
Total inventory
$ 293,989.19
Purchases and other mfrg. costs
3,960,333.06
Total
$4,254,322.25
Less: Inventory, Dec. 31, 1955
Materials
$175,215.08
Books on hand
267,323.48
Total
$ 442,538.56
Cost of goods sold
$3,811,783.69 After the end of 1955, by adjusting entries made on the books in September 1956, as of December 31, 1955, petitioner eliminated from income accrued from sales in 1955, $621,006.32, consisting of $8,760.31, "Sales Returns of Purchased Books", and $612,246.01, "Anticipated Returns". As of December 31, 1955, among the adjustment accounts set up on petitioner's books were new accounts *245 entitled "Sales Returns of Purchased Books", "Anticipated Returns", and "Reserve for Anticipated Returns", which were, respectively, debited and credited in the total amount of $621,006.32, which, in turn, represented actual returns in 1956 of books shipped in 1955, in the respective amounts of $95,556.33, New Pictorial; $516,689.68, Do-It, and $8,760.31, Sales Returns of Purchased Books. Of the anticipated returns of books as of the end of 1955, $621,006.32, there were taken into inventory of books as of the end of the year $323,148.35, which increased inventory as of the end of 1955 from $442,538.56 to $765,686.91, and reduced cost of goods sold from $3,811,783.69 to $3,488,635.34. In another adjustment account in the general ledger, "Inventory - New," a debit entry was made in September 1956, as of December 31, 1955, of $765,686.91, and "Cost of Goods Sold" was credited in the same amount. In determining the tax deficiency for 1955, respondent held (as was done also for 1954) that the difference of $297,857.97 between $621,006.32 (anticipated returns) and $323,148.35 (increase in inventory at end of year) was in effect a reserve for anticipated returns of merchandise which is not *246 allowable under any provision of the 1954 Code. Accordingly, one of the additions of respondent to petitioner's taxable income for 1955 was $297,857.97. In effect, petitioner deducted from 1955 income, as a reserve, $297,857.97; respondent disallowed the deduction. Petitioner's tax returns for 1955 and 1956 were prepared on a different basis from the 1954 return. On its 1954 return, petitioner eliminated from income $53,443.80, representing books that were unsold to the public by the merchants as of the end of 1954. On its returns for 1955 and 1956, a different approach was taken. Referring to the 1955 return, for example, petitioner eliminated from income all so-called "incomplete deals" with the chain store corporations and other merchants (rather than just the income from books unsold on the shelves of the merchants). Petitioner adopted the concept of an "incomplete deal" with a merchant as the situation when, on December 31, all of the numbered volumes in the series of a title (set of books, i.e., volumes 1 through 18) either had not been shipped to the merchant (although several of the consecutively numbered volumes had been shipped, such as volumes 1 through 4), or all of the *247 returns of unsold volumes in the complete series in a title had not been made by the merchant. Under this concept, petitioner eliminated from and did not report in income on its 1955 return $824,922.62, as is explained hereafter, and eliminated $503,947.41 from income on its 1956 return. Correspondingly, under this concept, petitioner reported income on its 1955 and 1956 returns on the basis of deals with merchants "completed" during the year, i.e., "completed deals." (Petitioner's tax returns for 1957-1960 were prepared and income was reported on the same basis as the 1955 and 1956 returns.) In other words, on the tax returns for the years 1955-1960, petitioner reported income under the theory that income accrued and was to be reported only for the year in which all of the quantities of all of the consecutively numbered volumes in the series of a particular title, or "set," of books had been accounted for by the merchant as sold to the public and the unsold volumes in the "set" had been returned to petitioner, so that the "deal," or promotion, involving the particular title of books, had been completed; income from a "deal," or promotion, of the entire title (set) of books accrued *248 and was to be reported for income tax in the year in which the merchant had completed both his sales of volumes to the public and his returns to petitioner of the unsold volumes in the entire set. Also, taking a title having 12 volumes in the "set" as an example, if volumes 1 through 5 were shipped by petitioner to the merchant in 1955, and volumes 6 through 12 were shipped to the merchant in 1956, and if the merchant sold to the public some of the volumes on hand in 1955 and returned some of the volumes to petitioner in 1955, and if the merchant finished sales to the public in 1956 of all volumes on hand and made returns to petitioner in 1956 of all of the unsold volumes, the petitioner would not report in its income for 1955 any income with respect to this title of books, even though some of the books were sold in 1955, but would report all of the income in 1956; no costs or expenses relating to this title of books would be deducted in 1955; and all of the costs and expenses relating to this title of books would be deducted in 1956. Attached to petitioner's 1955 tax return is an explanation of how it computed the income and deductions for 1955 on the basis of "deals completed" in *249 1955, which includes the following: The taxpayer's books of original entry and subsidiary records were analyzed in order to determine which contracts were complete and final settlement made as at 12/31/55 and those which were still incomplete at that date. In order to place the completed and uncompleted deals on the same basis at 12/31/55 for the purpose of determining the applicable cost of those sales, credits to customers on volumes which the taxpayer anticipates being returned on the uncompleted deals were accrued based upon statistical experience as well as the cost of said anticipated returns. [Emphasis added.] An allocation percentage was determined by taking the proportion that the net sales of completed deals bear to the total net sales and this percentage was then applied to the total cost of sales in order to determine the cost of sales of completed contracts. The same percentage was then applied to each of the individual expenses in order to arrive at those which are deductible against current years income. The balance of expenses which were deemed applicable against the sales of uncompleted contracts were deferred. On its 1955 return, petitioner reported as income from *250 deals completed in 1955, taxable income in the amount of $252,190.06, as follows: Gross sales, out of $8,108,088.16
$2,890,292.61
Less: Books returned in 1955
711,659.37
Net sales
$2,178,633.24
Less: Cost of goods sold
Inventory 1/1/55
$ 293,989.19
Allocated mfrg. costs
1,020,980.98
1,314,970.17
Gross profit
$ 863,663.07
Other income (allocated)
15,193.93
Total income
$ 878,857.00
Less: Allocated expenses
626,666.94
Taxable income
$ 252,190.06 Also, petitioner reported on the return "deferred income" ("Incompleted Deals") of $824,922.62, in the balance sheet, Schedule L. Petitioner's books of original entry and subsidiary records were not kept during the calendar year 1955 (and the later years) under a method that would reflect deals completed in 1955 and deals started in 1955 but not completed at December 31, 1955. The amounts set forth on the 1955 return, supra, were the result of computations and adjustments made in the books in 1956, during the period January 1 to about September 15, 1956, which were made in connection with the preparation of the 1955 tax return. Attached to and made part of the 1955 tax return is a long schedule on which there are 3 columns of figures; first, the amounts entered in *251 petitioner's books of original entry and subsidiary records in the course of business during 1955; second, figures representing allocations of the column 1 amounts to the so-called "Incompleted Deals, Deferred"; and third, the differences between the respective amounts in column 1 and column 2, representing the amounts of the so-called "Completed [in 1955] Deals." This schedule is incorporated herein by reference. The following is a somewhat abbreviated form of that schedule. The amounts in column 1, "Total Per Books," are the total amounts on December 31, 1955, which had been entered on the books during 1955 in the course of business. The amounts in column 2 and in column 3 are the amounts which were computed in 1956 in connection with preparing the 1955 return, and they reflect adjusting entries made and adjustment accounts set up on 1956 on the "as-of" basis, dated back to December 31, 1955: 2
1
Deferred In-
3
Per Books
come "In-
Per Tax Return
Sales &
complete
"Completed
Per Books, Total Income & Costs
Expense
Deals"
Deals"
Gross sales, total shipments
$8,108,088.16
$5,217,795.55
$2,890,292.61
Less: Returns in 1955, actual
(1,171,745.68)
(460,086.31) [2]
(711,659.37) [2]
Anticipated returns [1]
(621,006.32)
(621,006.32)
Net sales
$6,315,336.16
$4,136,702.92
$2,178,633.24
Less: Cost of Sales
Inventory 1/1/55: Materials
$ 42,962.44
Books
251,026.75
Total inventory
$ 293,989.19
$ 293,989.19
Purchases
$3,946,195.40
Plates
11,569.73
Other costs
2,567.93
3,960,333.06
$2,939,352.08 [3]
1,020,980.98
Total costs
$4,254,322.25
$2,939,352.08
$1,314,970.17
Less: Inventory 12/31/55: Materials
$ 175,218.08
Books on hand
267,323.48
$ 442,538.56
Antic. returns of books
323,148.35 [4]
12/31/55 Inventory
765,686.91
765,686.91
0
Cost of sales
3,488,635.34
2,173,665.17
1,314,970.17
Gross profit
$2,826,700.82
$1,963,037.75
$ 863,663.07
Other income: Purch. discs.
$ 43,063.69
Commissions
979.87
44,043.56
28,849.63 [5]
15,193.93
Total Income
$2,870,744.38
$1,991,887.38
$ 878,857.00
*252 2
Deferred
3
Deducts.
Per Tax Re-
1
"Incom-
turn Deducts.
Expenses Per Books for Tax
Expenses Per
pleted
"Completed
Return Deductions
Books
Deals" [6]
Deals" [7]
Compensation of officers
$ 138,750.09
$ 90,884.77
$ 47,865.32
Salaries & Wages
134,751.39
88,265.53
46,485.86
Rent
12,706.86
8,323.31
4,383.55
Repairs & maintenance
499.90
327.45
172.45
Taxes
21,719.29
4,780.33
16,938.96
Contributions
45,280.00
29,659.53 [8] *253 13,273.16
Advertising
246,389.43
161,391.23
84,998.20
Other deductions
1,195,882.05
783,332.61
412,549.44
2,347.31 [8]
Total Deductions
$1,795,979.01
$1,166,964.76
$ 626,666.94 In Schedule L, Balance Sheets, of its 1955 tax return, petitioner reported, in liabilities, deferred income at the end of 1955 in the amount of $824,922.62, which was computed as follows, as shown in the schedules attached to the return, supra: Deferred income:
Deferred net sales
$4,136,702.92
Less: Deferred cost of sales
2,173,665.17
Deferred gross profit
$1,963,037.75
Deferred other income
28,849.63
Deferred total income
$1,991,887.38
Less: Deferred expenses & deduc-
tions
1,166,964.76
Net deferred income
$ 824,922.62
The same amount of net deferred income results if "Other Income", $28,849.63, that was allocated to "Incompleted Deals", is not taken into account, and deferred, deductible expense ($1,166,964.76) is reduced by $28,849.63 to $1,138.115.13, as follows: Deferred sales, incompleted deals
$4,136,702.92
Less: Costs of sales
2,173,665.17
Gross profit, incompleted deals
$1,963,037.75
Less: Deductible expenses
1,138,115.13
Deferred net profit
$ 824,922.62
In September 1956, various adjustment accounts *254 were set up in the general ledger in which adjusting entries were made on the basis of which income, expenses, and net income were deferred. In the adjustment account, "Deferred Income", No. 401, debit and credit entries were made in September 1956, dated back to December 31, 1955, as follows: Deferred Income, Account No. 401
1955
1955
12/31
[Returns] *
$ 460,086.31
12/31 [Sales]
$5,217,795.55
12/31
[Antic. returns]
621,006.32
12/31
[Def. cost sales]
2,173,665.17
12/31
[Def. expenses]
1,138,115.13 Deferred expenses
$1,166,964.76
Less: Other income
28,894.63
Allocated to incomplete deals
$1,138,070.13
**
$4,392,872.93
12/31
[Def. income]
824,922.62
$5,217,795.55
$5,217,795.55 The entries in other accounts in the general ledger related to the entries in "Deferred Income" were as follows: The general account, "Encyclopedia Sales" was debited $5,217,795.55; and credits were entered, $2,173,665.17 in an account "Purchases and Other Costs Transferred to Deferred Income"; $1,138,115.13 in an account, "Actual Expenses Transferred to Deferred Income"; $621,006.32 in an account, "Reserve for Anticipated Returns"; and $460,086.31 in an account, "Encyclopedia Sales Returns". *255 Various other adjusting entries were made. Respondent determined that petitioner improperly eliminated from the income accrued in 1955, the net amount of $824,922.62, and included that amount in taxable income. His explanation was that since it had been determined that the shipments of books in 1955 represented sales and not consignments, $824,922.62 was restored to taxable income. Respondent also determined that in effect petitioner had deducted $297,857.97 as a reserve for anticipated returns of books shipped in 1955, the difference between anticipated returns of $621,006.32 and restoration to inventory of $323,148.35, and he increased 1955 income by $297,857.97 for the reason that the amount did not represent a deductible item under any provision of the 1954 Code. In preparing its tax return for 1956, petitioner followed the same procedures and reported as its 1956 income, an amount computed on the basis of so-called "Completed Deals", and it eliminated from sales, costs, and expense accounts on its books, amounts for "Incompleted Deals" started in 1956. The tax return was filed on September 16, 1957. In 1957, in connection with the preparation of the 1956 tax returns, adjustment *256 accounts for "Incompleted Deals" were set up in the general ledger and adjusting entries were made in the various accounts, as was done for the 1955 tax return. Petitioner thereby eliminated from 1956 income the amount of $503,947.41, which was shown as deferred income in the balance sheet attached to the 1956 return. In the account in the general ledger, "Deferred Income, No. 401", a credit entry of $503,947.41 was made after the end of 1956, as of December 31, 1956. In the account, "Anticipated Sales Returns, No. 520", $1,361,162.76 was entered after the end of 1956, as of the end of the year. Of the anticipated returns, $605,430.25 was added to inventory, leaving a difference of $755,732.51. Respondent determined that petitioner improperly eliminated from its income for 1956, the net amount of $503,947.41 because it represented sales of books and not consignments, and restored that amount to income. He also disallowed a deduction of $755,732.51, the reserve for anticipated returns of books shipped in 1956. Petitioner's gross sales per books, or total shipments, in 1956 amounted to $14,230,393.32. Petitioner reported on its 1956 tax return as "Completed Deals" (in 1956) gross sales *257 of $8,613,138.12. In a schedule attached to the return, it reported as "Incompleted Deals", gross sales of $5,617,255.20. The following schedules show the computations, respectively, of income from "Completed Deals" of $455,146, reported in the 1956 tax return, and of deferred income of $503,947.41 from "Incompleted Deals" shown in the schedule attached to the return. Petitioner reported in its 1956 return net taxable income of $361,222.58, computed as follows: Net income from "Completed Deals",
after costs and deductions
$455,146.00
Other income
56,152.99
Income from all sources
$511,298.99
Less: Loss, worthless stock
150,076.41
Net income
$361,222.58
Petitioner's computation of income from "Completed Deals" in 1956 is as follows: "Completed Deals", 1956
Gross sales
$8,613,138.12
Less returns of books: Book returns antic. 12/31/55
$ 621,006.32
Books returned in 1956
1,587,574.94
Total returns 1956
2,208,581.26
Net completed sales
$6,404,556.86
Inventory 1/1/56: On hand
$ 267,323.48
Antic. returns
323,148.35
Total
$ 590,471.83
Other costs
3,935,870.47
$4,526,342.30
Inventory 12/31/56: On hand
543,056.43
Antic. returns
605,430.25
1,148,486.65
$3,377,855.62
Deferred costs 1/1/56 of Incompleted Deals
2,164,713.78
$5,542,569.40
Deferred mfrg. costs 12/31/56
1,991,354.72
$3,551,214.68
Other costs
65,560.83
$3,616,775.51
Less: Cost of goods sold
$3,616,775.51
Gross profit from sales
$2,787,781.35
Less: Deductions
2,332,635.35
$ 455,146.00
Add: Other income
56,152.99
$ 511,298.99
Less: Loss
150,076.41
Net income
$ 361,222.58
*258 Petitioner computed deferred income on "Incompleted Deals" (in 1956) as follows: Deferred Income as of 12/31/56
Incompleted Deals
$5,617,255.20
Less: Actual returns in 1956
999,436.29
$4,617,818.91
Less: Antic. returns
1,361,162.76
$3,256,656.15
Less: deferred cost of sales: Mfrg. costs
$1,991,354.72
Other costs
80,963.12
2,072,317.84
Deferred gross profit
$1,184,338.31
Less: Deferred deductions
680,390.90
Net deferred income
$ 503,947.41
During 1956, as in 1954 and 1955, petitioner entered all shipments of books as sales, when shipped, in sales accounts maintained in its subsidiary and general ledgers for the several titles of books dealt in during 1956; and entered in related accounts as accounts receivable the amounts of the sales. Actual returns of books during 1956 reduced the amounts of sales; the accounts receivable were reduced by cash payments received and books returned during the year. The adjusting entry as of the end of the year for anticipated returns of books in the amount of $1,361,162.76 represented returns of books in 1957, out of books shipped in 1956, up to the time the tax return for 1956 was filed in September 1957. During 1956, petitioner dealt in more titles of books, namely, *259 Illustrated Encyclopedia of the Modern World, in 20 volumes; Junior Classics, in 12 volumes; Pictured Knowledge, 14 volumes; Popular Mechanics Junior Do-It Yourself Encyclopedia, 12 volumes; and RCA Victor Encyclopedia of Recorded Jazz, 12 album set. Petitioner continued to sell, also, 20th Century Encyclopedia, New Pictorial Encyclopedia of the World, and the Do-It-Yourself Encyclopedia. Petitioner has conceded the correctness of the following determinations of the respondent: 1954, disallowance of $6,600 consulting fees; 1955, disallowance of $5,000 travel and promotion expense; 1956, disallowance of $10,000 travel and promotion expense. Ultimate Findings (1) Contracts executed in the taxable years by petitioner with various merchants to whom petitioner made periodical shipments of books under invoices were "sale or return" contracts, not consignments. Each invoiced shipment of books constituted a present sale of books, title to which passed from petitioner to the merchant. (2) At the end of each taxable year, petitioner's liability to make refunds for returned books was a future and contingent liability. Petitioner could not accrue at the end of the year and take a deduction for *260 the expense of such refunds to merchants in the amount of actual returns of books made and refunds paid after the end of the taxable year, which were not fixed and did not accrue at the end of year. (3) No provision of the Code and regulations permits petitioner to take a deduction for a reserve for anticipated returns of books. (4) Petitioner did not file its return for each taxable year and compute its taxable income under the method of accounting on the basis of which it regularly computed its income in keeping its books, which was contra to section 446(a) of the Code. Petitioner filed each return and computed the taxable income therein on the basis of socalled adjusting bookkeeping entries which were not consistent with petitioner's regular method of accounting, which were not on the basis of petitioner's annual period of accounting and reporting income, which were not proper under its accrual method of accounting, and which were based upon a period and events subsequent to its taxable year ending on December 31. Opinion The issues are whether it was proper for petitioner to make particular adjustments in its general ledger dated back to December 31 of each taxable year, in the *261 form of year-end adjustments, for income tax purposes, which reduced sales of books delivered to merchants during the year and increased inventories of books, on the basis of socalled "anticipated returns" of books in the following year; and whether a deduction was allowable for each year for a reserve for "anticipated returns" of books. Since the adjusting entries made as of the end of 1955 and 1956 were made under a different treatment of petitioner's dealings with merchants than the adjusting entries made as of the end of 1954, petitioner makes alternative contentions; that the 1955 and 1956 adjustments were proper but if not, those for 1954 were. Petitioner's position is if one type of year-end adjustments is approved, the parties will be able under Rule 50 to compute the amount of the taxable income for each of the 3 taxable years on the same basis under the type of year-end adjustments which is approved. Respondent disagrees with all of the contentions and proposals of the petitioner. Under all of the questions, petitioner had the burden of proof. It has been necessary to set forth in the findings details about It has been necessary to set forth in the findings details about *262 petitioner's method of maintaining its accounting records and the bookkeeping entries made in the course of business during each year (which were substantially the same in each year) in the general ledger, in order to provide an understanding of the adjusting entries made after the close of each year, dated back to December 31. On December 31 of each year, petitioner did not know the actual amounts of books in the hands of each merchant that might be returned, because not sold, during the next year, out of deliveries made during a taxable year. By means of obtaining extensions of time for filing each tax return, petitioner kept its books for 1954 open 6 months, and its books for 1955 and 1956 open 8 months; and during the respective periods in 1955, 1956, and 1957, petitioner received returns of books from merchants which petitioner had delivered to them in 1954, 1955, and 1956. Then, largely on the basis of actual returns, petitioner made the so-called adjusting entries for so-called "anticipated returns", dating them back to December 31, 1954, 1955, and 1956, respectively. In general, petitioner contends that the contracts with the merchants in the taxable years were consignment *263 contracts, rather than contracts of sale with the merchants' having the right to return individual volumes of unsold books; and that income did not accrue to it when each shipment of books under a contract was delivered to a merchant. With respect to the time when income accrued to it, petitioner makes alternative contentions: (1) It argues that each contract should be treated for tax purposes on the basis of a "completed deal" involving all of the books and time they were on sale and that no income accrued under a contract until the end of 20 or 26 weeks after the first delivery of books was made to the merchant, at the end of which period of weeks the merchant had completed all sales to the public, had accounted in full to petitioner for the total amount of all sales, and had determined the amount of all of the unsold volumes for the whole period to be returned to petitioner for credit or refund. Or (2) that as a merchant sold each book to the public, income from each individual sale accrued to petitioner, because the title to a book passed from petitioner when the merchant sold it to the public. Under both contentions, petitioner argues that it retained ownership of the books shipped *264 to a merchant until either (1) the whole deal was completed, or (2) the merchant sold each individual book to the public; and that the shipped books remained part of petitioner's inventory until either (1) the whole deal was completed, or (2) until the merchant sold each book. Respondent determined, and he contends, that petitioner made an absolute and present sale of each shipment of books at the time of the delivery and sending of an invoice; that the contracts executed in the taxable years were sale contracts, known as "sale or return" contracts, under which the merchant agreed to pay for each shipment of books at a fixed price, at a fixed time (such as 10 days after the date of the invoice, or 30 days, depending on the terms stated in the contract), and under which, also the merchant assumed all risks of loss of or damage to the merchandise; that title to each shipment of books passed from petitioner to the merchant at the time of delivery; and that if and when the merchant exercised the right to return any of the books (because not sold) the title to those books revested in petitioner at the time they were returned. He contends, therefore, that income accrued to petitioner at *265 the time of each delivery and sale of a quantity of books. Respondent contends that petitioner's so-called adjusting, accounting entries, made as of the end of each taxable year, were improper; and that petitioner did not keep its accounting records, or report income, under a consistent method of accounting, or under a method that clearly reflected its taxable income for each year on an accrual basis. Respondent contends, further, that petitioner took for each year a deduction for a reserve for "anticipated returns" of books, for which no deduction is provided or allowable for the taxable years under any Code provision, especially since petitioner's business is the sale of merchandise. The dispute involves interpretation of the contracts between petitioner and each merchant executed in each taxable year. It must be determined whether the contracts were contracts of sale, with the right of the merchant to return the unsold books, if in good condition, or were consignment contracts creating an agency in the merchant to sell books for petitioner and to account to it for the proceeds of the sales. The following matters relate to the contracts executed in the taxable years, and the general *266 evidence: The parties agreed to the admission in evidence of several copies of the contracts, and stipulated that they "are copies of representative types of contracts utilized by petitioner in the disposal of its publications in the years indicated." (Emphasis added.) It is understood that the last 4 words of the stipulation, underlined above, mean that the date on the copy of the contract admitted in evidence is to be taken as showing that the contract was a type of contract utilized by petitioner in the year appearing in the particular date written on the copy of a contract. Under the stipulation, 10 copies of contracts were received in evidence. Of these, 4 bear dates in 1954; 2 bear dates in 1955; and 1 bears a date in 1956; so that 7 of the agreements represent the types of agreements executed in the taxable years by petitioner and the respective merchants. But 3 contracts bear dates in 1957, 1958, and 1959, respectively. At the trial, copies of 2 more contracts were received in evidence, bearing dates in 1955 and 1956. There are, therefore, 12 copies of contracts; 9 are representatives of those used in the taxable years; and 3 bear dates of years after the taxable years. Since *267 we are obliged to determine the nature and legal effect of contracts executed in the taxable years, and because one exhibit out of the twelve, bearing a notation, "6/17/59" (exhibit 16-P), contains 4 provisions which are not in any of the other examples of contracts and make it markedly different, comment must be made about the contracts. Seven contracts are in the same form (3 dated in 1955; 2 dated in 1956; 1 in 1957; and 1 in 1958); and the terms and provisions are the same excepting for slight variations that are of no consequence. The contract included in our findings (with Schaffer Stores, October 3, 1955) is one of these 7 contracts. Four contracts, all bearing dates in 1954, contain substantially the same provisions as the 7 contracts identified above; but 2 bear the caption, "Consignment Sales Agreement"; and one, the caption "Guaranteed Sales Agreement"; whereas the 7 contracts bear the captions, "Book Order Form", and "Terms of Order". The terms of payment (for each shipment) are in the 7 contracts, supra, "Net 10 days from invoice date, freight prepaid"; the terms of payment in the 4 contracts in 1954, supra, are as follows: Exhibit 9-I, on the first 16 volumes, net 30 *268 days from date of invoice; merchant will pay on volumes 17 and 18 not later than 8 weeks from the date volume 18 goes on sale. Exhibit 10J, merchant to pay 82 cents per volume (except volume 1) weekly as merchant sells books; and petitioner agreed to allow a one percent discount on payments made within 10 days [from date of invoice]. Exhibit 11-K, fixed price per volume to be paid 10 days from date of invoice regardless of time of receipt of the weekly volume. Exhibit 8-H, merchant to make payment as it sells books. The evidence does not show the extent to which petitioner utilized in 1954 the type of contract represented by exhibits 8-H and 10-J. There is no evidence that the form of the 8-H and 10-J contracts were used extensively, and according to the stipulation of the parties that form of contract was not used in 1955 and 1956. The unique type of contract bearing notation of a date in 1959, exhibit 16-P, is discussed later. The first observation about all of the above exhibits, except 16-P, is that the price to be paid to petitioner per volume was a fixed price, and the time for payment by the merchant was net 10 days from the date of the invoice for each shipment of books, or *269 net 30 days from date of invoice (exhibit 9-I); and only in 2 contracts, exhibits 8-H and 10-J, was the merchant to make payments to petitioner as it sold books. It is noted, further, that exhibit 11-K, dated November 19, 1954, states: "Each shipment or delivery shall constitute a separate sale and failure or delay of delivery of any one shipment shall not vitiate responsibility of the merchant for shipments theretofore or thereafter made [within 10 days from the date of invoice]." The second observation is that in each of the 11 contracts, referred to above, except two, there is the following clause or a similar one: "Merchant assumes all the risks of loss or damage to books in its possession and shall not be entitled to any refund or allowance therefor." Also, in all of the contracts there is a clause to the effect that all federal, state, city, and local taxes, if any, shall be assumed and paid by merchant; and there is a clause in all of them that the merchant will pay the freight on the returned volumes. In every contract there is a clause stating that the written contract is the complete contract made by the parties. It is unnecessary to make any further comment about the terms *270 and provisions of the 11 contracts in evidence. The other provisions of a typical contract used by petitioner in the taxable years are set forth in the findings. It is concluded from all of the evidence that the contract set forth fully in the findings was typical and representative of the contracts used by petitioner in the taxable years; and that any variations in details of a particular contract used in the taxable years are of no importance or significance in the determination we are to make about the nature and legal effect of the contracts used by petitioner in the taxable years, since petitioner has not shown under its burden of proof that variations in minor details, if any, were of any substantial importance in respect of the issue under consideration. It is noted, further, that in this case, this Court has jurisdiction over only the 3 taxable years, 1954, 1955, and 1956. Therefore, the question for determination is limited to the nature and legal effect of the contracts executed in each of those years by petitioner with each merchant. References to 2 contracts with notation of a date in 1957 and 1958, respectively, (exhibits 15-O and 17-Q) have been made only to identify *271 the extent to which the evidence includes examples of the representative contracts; but, also, the fact that those 2 contracts are the same kind as petitioner used in 1955 and 1956 is of some significance. The evidence does not establish that petitioner used at any time during the 3 taxable years a contract containing the same clauses, or any of them, as clauses 7, 8, 9, and 10 of exhibit 16-P, June 17, 1959, hereinafter discussed. Since the contract set forth in the findings is representative of the form and provisions of the contracts used in the taxable years, the discussion hereinafter relates to it. The issue about the nature of the contracts has been presented by the parties as a general question. We are not called upon to deal with the variations in the forms of the contracts used in 1954; those used in 1955 and 1956 were in a standard form (the one in the findings), and in substance the 1954 contracts were not different from those used in 1955 and 1956. The nature and legal effect of the contract of petitioner with each merchant is to be ascertained from all of its clauses, taken together, rather than from any separate clause disconnected from the others, or from any name which *272 the parties may have given the instrument; and the ruling intention of the parties is to be gathered from all of the language they have used. It is the legal effect of the whole contract which is to be sought for. Heryford v. Davis, 102 U.S. 235, 244; McGaw v. Hanway, 87 A. 666; Arbuckle v. Gates, 30 S.E. 496; 11 R.C.L. 775, sec. 4. The contract we must construe is a clear one; we are unable to ascertain any ambiguities or inconsistencies in any of the provisions or in the contract as a whole. Petitioner, however, argues in this income tax dispute that the contract was ineptly drawn, does not reflect the intention of petitioner, and that the contract as written is not controlling in the determination of the tax issue. Petitioner's argument is an unusual one, and no decided case or authority is cited in support of its effort to avoid the impact of the provisions of the contract. The rule is well established that where parties have reduced to writing the terms of an agreement into which they have entered, their prior and contemporaneous oral negotiations appertaining to the agreement are presumed to have been merged in the writing, and that the terms of the agreement cannot be varied *273 or changed or modified or even explained by parol testimony. See Gianelli v. Globe Grain & Milling Co., 191 P. 720. Harold Drimmer was petitioner's chief witness. He was general manager and an officer of petitioner during the taxable years, and was primarily responsible for the disposition of petitioner's publications and the contracts with the merchants. In his testimony, Drimmer claimed that the contract was one of consignment and that title to books shipped to merchants remained in petitioner. His testimony represents his conclusions and interpretation of the contract. But the nature and legal effect of the contract is the question for this Court to determine. Drimmer's testimony is selfserving, in petitioner's behalf. It is not corroborated by disinterested representatives of the merchant-corporations who entered into the contracts. The only other witness was McConnell, now employed as a sales representative of petitioner. He formerly was employed by Colonial Stores which entered into a contract with petitioner. His testimony, like Drimmer's is self-serving, in behalf of petitioner. Insofar as the testimony of these witnesses represents an attempt to change, modify, or vary the *274 terms and provisions of the contract, no weight to such testimony can be given, and we are not bound by their conclusions and interpretations of the contract, the question which we are called upon to decide. Moreover, under cross-examination, Drimmer admitted that the intent of the parties is to be found in the provisions of the contract, and he testified that, "The contract speaks for itself." We turn now to consideration of the contract. The contract stated a fixed price per volume to be paid by the merchant. In the instance of New Pictorial Encyclopedia, the price was 25 cents per book for volume 1, and 82 cents per book for each of the succeeding volumes, 2 through 18. The time of the payment for each shipment of books under the contract was fixed. In most of the contracts, payment by the merchant was to be made within 10 days from the date of the invoice; in some, it was to be made within 30 days from the invoice date. Under each contract, with a merchant, petitioner was to make several shipments of books so as to supply the merchant with quantities of a new volume each week. The evidence shows that petitioner sent the merchant an invoice for each shipment of books. Thus, the *275 merchant agreed to pay a price for each shipment. The merchant assumed all the risks of loss or damage to books in its possession, and was not entitled to any refund or allowance for damaged or lost books. Analysis of the representative contracts shows that they were contracts for a 10-day sale at a fixed price of books shipped, for which the merchant at once became responsible, and necessarily at the same time acquired title to the books. In each shipment of books, petitioner was the seller and the merchant was the buyer. Upon the delivery of a shipment of books and the sending of the invoice, or bill, petitioner was entitled to receive the contract price. The general rule is that when the terms of sale are agreed upon and everything that the seller has to do with the goods is complete, the contract of sale becomes absolute and the property and risk incident to the goods rest in the buyer. Benjamin on Sales (4th Ed.) 309, 310; 2 Williston on Sales 38, sec. 273; 77 C.J.S. 1065, sec. 266; Arbuckle v. Gates, supra; Arbuckle v. Kirkpatrick, 39 S.W. 3; Gianelli v. Globe Grain & Milling Co., supra; Aiello v. Sliskovich, 163 P. 2d 768; and Bernadette, Joseph & Co., v. Van Buren, 209 N.Y.S. 559, 561. *276 The contract gave the merchant the right to return to petitioner, at the merchant's expense, all unsold volumes in good condition, for full credit less advertising allowance, within a specific time, such as 90 days from the on-sale date. The privilege of returning the books was not dependent upon the quality of the merchandise but rested entirely upon the option of the merchant. The type of contract utilized by petitioner incorporated the characteristic terms of a class of contracts known as a "sale or return" contract. See Sturm v. Baker, 150 U.S. 312, 328 where it is said: "In this class of cases the title passes to the purchaser subject to his option to return the property within a time specified, or a reasonable time, and, if * * * the property is destroyed, even by inevitable accident, the buyer is responsible for the price." Section 19, Uniform Sales Act, states the general rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer, and Rule 3(1) provides that "when goods are delivered to the buyer 'on sale or return,' * * * indicating an intention to make a present sale, but to give the buyer an option to return *277 the goods * * *, the property passes to the buyer on delivery, but he may revest the property in the seller by returning * * * the goods within the time fixed in the contract or * * * within a reasonable time." In the Uniform Commercial Code, Art. 2, Sales, section 2-326(1)(b), it is said that if delivered goods may be returned by the buyer, even though they conform to the contract, the transaction is a "sale or return," if the goods are delivered primarily for resale; and in section 2-327(2) it is said that under a sale or return "the option to return extends to the whole or any commercial unit of the goods while in substantially their original condition, but must be exercised seasonably, and the return is at the buyer's risk and expense." See, also, Consolidated Paper Co. v. Nims, 10 N.W. 2d 833, 834, where the following appears: There are marked distinctions between a sale with the privilege of return * * * and a conditional sale or bailment * * *. * * * in a sale with the privilege of return title passes on the delivery, but the vendee has the privilege of revesting it in the vendor by returning the goods. Drimmer testified that the merchants would not have taken the books unless *278 they could return books that were not sold. Drimmer noted, also, that petitioner could resell to some other merchant the returned books, but such is ordinarily the situation where the vendee has the right to return to the vendor commercial units of merchandise, under a contract of sale or return. Upon consideration of all of the evidence, it is concluded that the contracts utilized by petitioner during the taxable years were contracts of sale, giving the merchant the right to return the unsold volumes of books within a specified or reasonable time; that the title to each shipment of books passed from petitioner to the merchant when it was delivered and an invoice was sent; and that when the merchant made returns of books to petitioner, title to those books revested in petitioner. Therefore, income accrued to petitioner in respect of each shipment of books at the time of each sale (delivery of a shipment and the invoice); the shipped books did not remain part of petitioner's inventory; and the time for a deduction by petitioner on account of books returned by a merchant was when the books were returned, at which time those books were returned to petitioner's inventory. The typical *279 contract contained all of the elements of a sale and the transmission of ownership; for each shipment the merchant was bound to pay a fixed price at a fixed time, and the merchant then assumed all of the risks at once of ownership and possession of the shipment of books. Petitioner has not established, and analysis of the contracts and all of the evidence does not establish, that an agency existed under each contract, rather than a sale. Each merchant had his own place of business. Most of the merchants were engaged in a business of operating supermarket food stores. None was known as carrying on a business, primarily, of selling the goods of others. Each sold the books in question in the same way that it sold all of the other merchandise in its store, whether the goods were canned food, frozen or fresh food, or books, or brooms. Each merchant sold the books to its customers in the usual course of business along with other goods of every kind. Each merchant sold the books under its own name. Each merchant agreed to sell each volume to the public at a resale price prescribed by petitioner (such as 25 cents for volume 1, and 99 cents for each subsequent volume in the series). However, *280 a prohibition against selling to the public below a fixed retail price is a very common device which is frequently resorted to by a manufacturer or vendor in order to maintain retail prices and diminish competition. The fact that petitioner reserved the right to fix, and did fix, the resale price at which the merchant would sell each volume does not prove that each merchant was an agent of petitioner under a consignment contract; and that fact cannot neutralize or control the distinct elements of a sale contained in other provisions of the contract. See Arbuckle v. Gates, supra, p. 497. Drimmer, in his testimony, and petitioner on brief insist that the typical contract used in the taxable years with every merchant created a relationship of principal and agent, between petitioner and the merchant, and that the contract created a consignment of the books. The contract does not state that the merchant is to sell the books as an agent for petitioner's account; or that the books were consigned to the merchant and were to remain the property of petitioner until sold, and that after the sale all the proceeds were to remain petitioner's property to be accounted for by the consignee. Neither *281 does the clause dealing with a report every 10 days by the merchant to petitioner, about sales of books and "each store's inventory by volume," support petitioner's theory that the contract was one of consignment under which the merchant was a bailee and an agent. This particular clause in the contract is not a provision for accounting for the proceeds of sales such as is the ordinary provision in a consignment agreement, where goods and the proceeds from sales thereof, by a factor or consignee or agent, remain the property of the consignor. It was understood by the merchants, and they agreed, that petitioner would determine what quantity of each consecutively numbered volume would be shipped; and that petitioner would make such determinations on the basis of its own judgment about diminishing demand of the public for each succeeding volume (the fatigue factor). Petitioner's plan for selling books on the basis of a new volume per week involved a formula of petitioner for estimating a diminishing consumer demand. It was evidently part of petitioner's understanding with each merchant that the merchant's 10-day reports on sales of books would indicate to petitioner the trend of consumer *282 interest, which in turn would enable petitioner to make a determination about what quantity of each succeeding volume the merchant could expect to resell, therefore, the respective quantities of each consecutive volume should be shipped to the merchant. The merchant did not want to tie up its funds in payments 10 days from the date of each invoice in larger quantities of each numbered volume than it could reasonably expect to resell to the public, even though the merchant could return unsold books. Hereinafter, further reference is made to the absence of evidence about any other use of such reports which petitioner might have made for accounting purposes. Again it is noted that the nature and legal effect of the contract used by petitioner in the taxable years are not to be determined by any single clause in the contract, if the clause about the 10-day reports by a merchant can possibly be understood as having been intended to have any meaning other than that indicated above. The nature of the contract must be determined from the entire contract, as a whole. Heryford v. Davis, supra; Arbuckle v. Gates, supra; 11 R.C.L. 775, sec. 4, supra. In Arbuckle v. Gates, supra, p. 497, it *283 is stated, in effect, that an agreement cannot be a contract of sale and at the same time constitute the buyer simply an agent of the seller to hold the property until sold. "The two things are incompatible and cannot co-exist. " One party cannot treat a sale contract as one of sale, at one time, and as one of an agency and consignment, at another time, to suit his varying inclinations. The courts will look at the real nature of a contract and determine its nature from all of the provisions taken together, not from some separate provision considered independently of the others. A contract of sale transferring the title to the goods is not a mere agency; a contract of sale transferring title to goods is made by an agreement under which the recipient of the goods is required to pay a price fixed in advance for them within 10 days, 30 days, or some such fixed time, whether or not he sells the goods before the time of such required payment. 11 R.C.L. 775, sec. 4. Petitioner (as stated before) has asked us, in effect, to disregard the exhibits admitted in evidence under a stipulation stating that they are representative of the contracts utilized in the taxable years, and to make the determination *284 of the question on the basis of a purported form of contract represented by exhibit 16-P, which petitioner failed to prove was the type of contract used in the taxable years. This cannot be done for the following additional reasons. Exhibit 16-P contains several clauses which are not contained in and are markedly different from the provisions in the 9 agreements submitted as typical of those entered into by petitioner during the taxable years, one of which is set forth in our findings. The report of the revenue agent who examined petitioner's tax returns for 1954, 1955, and 1956 was completed and made available to petitioner by April 27, 1959, in which he concluded that the petitioner made sales of books to merchants at the time of the deliveries of books to them under "sale or return" contracts. There is a strong inference, left unexplained by petitioner, that after receiving the agent's report in April 1959, the petitioner may have changed the terms of its forms of contract in an attempt to make future contracts consignment agreements, rather than "sale or return" contracts. Exhibit 16-P is a printed sheet of paper, without the signatures of parties, which on its face is not an executed *285 contract. The evidence does not establish that such form of contract ever was entered into by petitioner and any merchant during any of the taxable years, or to what extent, if any, it was used by petitioner in transactions with merchants after April 27, 1959. There is a handwritten notation, in ink, in the margin of exhibit 16-P, "Acri Wholesale Grocers, 6/17/59," but there was not offered or admitted into evidence any copy of an executed agreement signed by petitioner and Acri. The new provisions in the printed form, exhibit 16-P are; "invoice" is described as a "memorandum of invoice"; the amount to be paid within 10 days after "transmittal of memorandum of invoice" is described as a "deposit" "equal to the total price to you of the books so shipped"; the merchant is required to "keep the proceeds of sale in a segregated account and remit same to us with each accounting"; and it is provided that "Title to all merchandise so consigned and shipped shall in each instance remain with us until so paid for." In none of the contracts shown by the evidence to have been used and executed by petitioner and merchants during 1954, 1955, and 1956 do such provisions appear. Petitioner's reliance *286 upon exhibit 16-P is misplaced and unjustified because the evidence does not show that any contract used by petitioner in the taxable year was the same as exhibit 16-P, or even was similar. No weight can be given to that exhibit. It has been concluddded that petitioner made a sale of each invoiced shipment of books under a sale or return contract. The merchant was obligated to pay a purchase price at a fixed time under the invoice. Whether or not some merchants always paid the invoice under the terms thereof is not material. Drimmer testified that petitioner endeavored to obtain compliance with each contract. Even though we have been obliged to determine the nature and legal effect of the contract, the ultimate question relates to determining the amount of petitioner's accrued income in each taxable year. The tax question is controlled by the principles stated in the following cases: Brown v. Helvering, 291 U.S. 193, 199; Spring City Foundry Co. v. Commissioner, 292 U.S. 182; and Security Flour Mills Co. v. Commissioner, 321 U.S. 281. See, also, Commissioner v. Hansen, 360 U.S. 446, 463. It is the right to receive payment, not the actual receipt, which determines whether income *287 has accrued and must be included in the gross income of an accrual basis taxpayer. Income accrues at the time the right becomes fixed. The same principle applies to deductions allowable under an accrual method of reporting income. It is concluded and held that petitioner's right to receive payment of the fixed price for each shipment of books became fixed on the basis of each invoice, and income accrued to petitioner for the sale of the books under the terms of each invoice. That is to say, income from sales of books accrued to petitioner during each of the taxable years as the invoiced deliveries were made. Moreover, it appears from the general ledgers that during the year, petitioner kept its books on that basis, entering in the respective accounts for sales and accounts receivable the amount of each invoice. It is concluded, further, and it follows, that with respect to books returned to petitioner by merchants, allowable deductions for the related refunds or credits accrued to petitioner in the year in which books actually were returned; at which time, also, the property in the returned books revested in petitioner and then (but not before) increased petitioner's inventory of *288 books. Other controlling principles are that the income tax is determined on the basis of a fixed annual accounting period; that taxable income shall be computed by the taxpayer, in the first instance, under a method which clearly reflects income of the taxpayer's annual accounting period; and that the taxpayer is required to employ a consistent method of reporting income. Section 446, 1954 Code. "The uniform result has been denial both to government and taxpayer of the privilege of allocating income or outgo to a year other than the year of actual receipt or payment, or, applying the accrual basis, the year in which the right to receive or the obligation to pay, has become final and definite in amount." Security Flour Mills Co., supra. Petitioner did not report its income for the 3 taxable years under a consistent method due to its several, so-called year-end, adjusting entries in its books of account, which were made on a different basis in 1954 than in 1955 and 1956. Not only did petitioner fail to include in its gross income for each year the total amount of the income from the sales of books that had accrued in each calendar (taxable) year, but, also, petitioner in substance *289 improperly computed the amount (for each year) of the total deduction for refunds and credits to merchants for returned books. Petitioner computed the amount of such deduction for 1954 on the basis of a period of 18 months, and for 1955 and 1956, on a basis of 20 months by keeping its books open and waiting for the receipt of actual returns of books after December 31, in the next year. Also, such computation of the amount of the deduction for refunds and credits for returned books was not made on an accrual basis, since the obligation to pay refunds and allow credits did not accrue to petitioner until each merchant determined the quantity and amount of the unsold volumes and exercised his option under the sale or return contract to actually return such books to petitioner. Thus, in the tax return for each year, the deduction for returned books was in effect computed on a cash rather than an accrual basis, which was improper; and, too, violated the requirement that income must be computed and reported on the basis of the taxpayer's annual accounting period, which in petitioner's case is a 12-month calendar year. Respondent's determinations for each year must be sustained. He properly *290 disregarded the so-called year-end adjusting entries for each year in petitioner's books of account. They were improper. The foregoing ought to suffice. But due to petitioner's alternative contentions and its unique "adjusting entries" we regard the following observations as pertinent. Reference is now made to standard accounting procedures for consignments of goods, which petitioner did not follow in its day-by-day maintenance of its accounting records. Since a consignment is not a sale and title to the goods remains with the consignor, consignment accounts should not be kept in the accounts receivable ledger; merchandising accounts are kept on either a perpetual inventory basis or a periodical inventory basis; and if any goods sent out on consignment are unsold when the consignor closes his books, they should be included in the consignor's inventory. Accounts may be or may not be kept to show consignment sales separately from regular sales. But regardless of various conditions, the consignor will have an account with each consignment. See Finney & Miller, Principles of Accounting - Advanced, Fifth Edition, pp. 89-113, Ch. 6. In Finney & Miller, supra, it is also said (p. 103) that *291 "Both the consignor and the consignee should keep a separate account with each consignment. If there are several consignments between the same parties, each consignment must be settled for separately, and the accounts should therefore clearly show the facts relative to each assignment." It is further stated (p. 91) "Consignment transactions are not so common as they formerly were. * * * Also, there has grown up a tendency to make sales with return privileges"; and (p. 90) an advantage to the consignee is that he does not undertake the risks of fluctuations in market prices [where he is to sell goods at market prices] [as in the produce field] such risk remaining that of the consignor, the consignee being paid a commission for his services. In Finney & Miller, Principles of Accounting - Intermediate Fifth Edition, p. 207 the following is said: Memorandum charges to consignees for goods shipped should not be included in accounts receivable because title to the merchandise has not passed to the consignee and there is no valid claim against him. Receivables from consignees arise only upon the sale of the consigned goods. and at p. 174, the following is noted: "The point of sale is generally *292 regarded as the point of revenue realization. * * * Delivery to the vendee is a general test of the passing of title, and for general accounting purposes * * * it is advisable, for convenience, to regard a sale as having been made when the goods are invoiced and delivery or shipment is made to a purchaser. (Delivery alone is not a sufficient test because delivery may be made on consignment.)" In Finney & Miller, Principles of Accounting - Introductory, Fifth Edition, pp. 438-439, it is said that the consignor should not record consignments as sales because there is no change in the ownership of the goods; the sales entry should not be made until the sale has been reported by the consignee. The general ledger, only, for each taxable year is in evidence; the subsidiary ledgers are not in evidence. The general ledgers show that petitioner entered in both the account for accounts receivable and the account for sales of books the invoiced amount of each shipment of books to merchants. Accounts Receivable was debited with the amount of a shipment and was credited with cash payments and returns of books. The evidence does not show that petitioner set up accounts in its books for "consignments" *293 of books, as distinguished from sales; and it does not show what the inventory accounts and the profit and loss accounts were or how they were kept during each taxable year. Those accounts probably were kept in subsidiary ledgers and they are not in evidence. Since the general ledger for each year does not contain the regular inventory account or the profit and loss account, it is not possible to ascertain how petitioner maintained the inventory account during each year, or how it took up in the profit and loss account the profit from each shipment of books to merchants. But, it is not permissible to enter as an account receivable the amount of goods shipped on consignment, if goods are consigned. By entering each invoiced amount of each shipment of books in accounts receivable, and by crediting accounts receivable with the amounts of books returned by merchants periodically during the year petitioner; on its books treated each shipment as a sale. The evidence indicates that petitioner reduced its inventory in the amount of each shipment, and later increased inventory for returned books. If petitioner had kept its accounts during the year on the basis of consignments, the shipped books *294 would have continued to be part of its inventory; the returned books would not be credited to accounts receivable; and inventory would have been reduced subsequently, at the time the merchant sold books to the public. Petitioner failed to prove that it kept its accounts during each year, in the course of business, on the basis of making consignments to merchants; and since invoices were sent to a merchant for each shipment of books, it necessarily followed that petitioner accounted for all shipments as sales to merchants at the time of sending the invoice and making a shipment. The evidence shows that in the course of business during each taxable year, petitioner maintained its accounts on the basis of making absolute sales of books shipped to each merchant. The evidence does not show that petitioner set up on its books consignment accounts for the books delivered to merchants. The accounting procedures of petitioner during each year reflect an intention of petitioner to treat each shipment as a sale. Regarding the 10-day reports of merchants on books sold and books in the merchant's inventory, there is no evidence that petitioner used such reports for the purpose of making entries *295 in its accounting records. If petitioner had kept its accounting records on the basis of making consignments of books, those 10-day reports would have served an accounting purpose, because on the basis of them petitioner would have reduced its inventory of consigned books when and as each merchant sold the books to the public, since property in consigned goods remains in the consignor until the consignee makes sales. Petitioner's failure to introduce any of those reports in evidence and to show whether they were used for making bookkeeping entries indicates that they do not support petitioner's contention that the contracts were consignment agreements. Wichita Terminal Elevator Co. v. Commissioner, 162 F. 2d 513. Petitioner failed to prove, also, that such reports were or were intended to be the type of reports ordinarily made by a consignee on the basis of which the consignor's inventory of consigned goods is reduced and income is realized by the consignor. As stated before, the 10-day reports of merchants appear to have been solely for the purpose of enabling petitioner to determine the quantities of each succeeding volume in the series to be shipped and sold by petitioner to the *296 merchant. The next point relates to petitioner's method of reporting income for 1955 and 1956. It adopted (and seems to have devised) its own unique method, which it described on its tax returns as the "completed deals" method. It reported income from deals "completed" in each taxable year, and it deferred income from deals "started but not completed" before the end of the year, "incomplete deals". It appears from petitioner's briefs that its real contention is that it is allowable for petitioner to report income for all of the taxable years, including 1954, under its so-called "completed deals" method, even if it is held by this Court that its contracts were contracts of sale. (It is petitioner's view that under a Rule 50 computation the parties would recompute petitioner's income for 1954 under petitioner's so-called "completed deals" method.) By means of adjusting entries made in 1956, 8 months after December 31, 1955, petitioner reported for 1955 only income from completed deals, and it reduced gross sales for 1955 by an amount representing so-called incomplete deals and deferred income to 1956. Petitioner followed the same procedure in 1957 for computing its 1956 income. The terminology *297 and method are petitioner's creation. Petitioner made an analogy to "long-term contracts"; its method was obviously borrowed from one of the methods of reporting income from "long-term contracts" which is permitted in respondent's Income Tax Regulations in section 1.451-3(b)(2). Petitioner erred. None of the methods allowed in the cited regulation can be applied to or in reporting income from contracts for merchandising operations. See 2 Mertens, Law of Federal Income Taxation, Sec. 12.132, Ch. 12, p. 395. The cited regulation defines "long-term contracts" to include construction and similar contracts, and limits the permitted methods of reporting income therefrom to the kinds of "long-term contracts" set forth in the definition. For example, section 1.451-3(b)(2) of the regulations permits reporting income from "long-term contracts" under a "completed contract method", and a "long-term contract" is defined as a construction contract "covering a period in excess of one year from the date of execution of the contract to the date on which the contract is finally completed and accepted." None of the provisions of section 1.451-3 apply to petitioner's business or to the contracts with *298 merchants. Petitioner is not entitled to report income for the taxable years under its own so-called "completed deals" method of reporting income. Respondent correctly determined petitioner's income for 1955 and 1956, and properly refused to recognize the yearend adjustments made for the purpose of reporting and computing income for 1955 and 1956 on the "completed deals" method, and of deferring income from sales to 1956 and 1957, respectively, as income from "incomplete deals". Petitioner does not cite any cases or authority for the method it used in reporting income for 1955 and 1956, which it claims should be used, also, in determining its income for 1954. The facts and the contracts with the merchants do not provide support for reporting income on the basis of so-called "completed deals". Petitioner's theory that no income accrued to it until a merchant completed selling every volume in a series of books and determined the quantities of all unsold books in the series, i.e., until the end of 20 or 26 weeks, is without merit, and is not supported by the terms of the contracts, or by any case or authority. The final question is whether petitioner was entitled to maintain and take *299 a deduction for a reserve for "anticipated returns" of books. In arriving at the amount of its taxable income, petitioner reduced profit by a figure representing a "reserve for anticipated returns". Petitioner set up an adjusting account in its general ledger for "anticipated returns", after the end of each year, and the entries therein were made several months after the end of the year and were dated back to December 31. The amount deducted for such reserve was $41,996.73 for 1954; $297,885.97 for 1955, and $755,732.51 for 1956. Respondent disallowed each deduction. Petitioner does not cite any Code provision, regulation, or case in support of the year-end "reserve for anticipated returns" of books and for the deduction taken for such reserve for each year. Respondent's determinations denying the deductions for the reserves for anticipated returns are sustained. See Readers' Pub. Corporation v. United States, 40 F. 2d 145, 148 (Ct. Cls., 1930), where the court stated: These so-called reserves are not deductible as business expenses, for the very good reason that expenses in order to be deductible must have been paid or incurred during the taxable year. The statute does not permit *300 reserves to be deducted but in exceptional cases such as insurance companies. It is also to be noted that the "reserves for returns" on the plaintiff's books are not allowable deductions because they are not actual reserves. A real reserve should represent an actual obligation, and the reserves set up in this case do not represent obligations for the years involved. The same reasoning applies in this case. On December 31 of each of the years, there was the possibility that a substantial quantity of the books shipped in the year would be returned by merchants in the next year; but as of December 31 of each year, there was not a fixed and then determined obligation of petitioner to take back a certain quantity of unsold books and pay refunds or allow credits in any fixed amount. Petitioner did not know at the close of each taxable year what amount of books (out of sales made in the taxable year) would in fact be returned by the merchants for refunds or credits in the next year. See, also, Wilson Furs, Inc., 29 B.T.A. 319; and Union Security Co., 16 B.T.A. 1412. The reserve for anticipated returns and the amount deducted each year was a reserve for future and contingent liabilities. *301 It is well established that a reserve to cover future or contingent liabilities cannot be deducted. Lucas v, American Code Co., 280 U.S. 445. There are no provisions in the Code and no case allowing this type of reserve to be deducted from income, as an expense or on any other basis. This is evident from the enactment and the subsequent retroactive repeal of section 462 of the 1954 Code by Public Law 74, June 15, 1955. That retroactive repeal of section 462 removed all provisions for allowing the type of deduction for a reserve which was taken by petitioner. There is another reason for denying a deduction each year for a reserve for anticipated returns of books. The adjusting entries for "anticipated returns" served to distort the income for the year. Testimony shows that the amount of the so-called reserve for anticipated returns was arrived at on the basis of the actual returns of books by merchants during the first 6 months of 1955 (for the December 31, 1954, reserve), during the first 8 months of 1956 (for the December 31, 1955, reserve), and during the first 8 months of 1957 (for the December 31, 1956, reserve). By means of obtaining several extensions of time for filing each *302 return late, petitioner kept its books open for 6 and 8 months, respectively, and then arrived at the figure for the so-called reserve for "anticipated" returns, and dated the entries on its books back to December 31 of each year. Thereby, petitioner deducted in each return, as total expense for refunds for returned books, an amount representing returns of books for 18 months, in the 1954 tax return, and for 20 months in each return for 1955 and 1956. The amount of the so-called reserve for "anticipated" returns for books, deducted from income for each taxable year, was not under any viewpoint, or the facts, a reserve for a liability that was fixed and determined on December 31 of each year. See Brown v. Helvering, supra. Petitioner has not cited any case in its briefs in support of any of its contentions; no cases were cited. Respondent's determinations for each year are sustained. The petitioner has made claims in its amended petition for deductions of carry-backs of net operating losses under section 172. The parties have agreed that they will make the computations, to the extent allowable, under Rule 50. Decision will be entered under Rule 50. Footnotes
2. Allocation of actual returns in 1955 to "Incompleted Deals" as of 12/31/55. ↩
1. Adjustment in Sept. 1956, as of 12/31/55. ↩
3. Allocation of costs of sales 1/1/55 to "Incompleted Deals", as of 12/31/55. ↩
4. Adjustment in Sept. 1956, as of 12/31/55 related to $621,006.32, anticipated returns. ↩
5. Allocation of other income to "Incompleted Deals" made in 1956, as of 12/31/55.↩
6. Allocation of expenses to deferred income from "Incompleted Deals". ↩
7. Allocation of expenses to 1955 income from "Completed Deals" in 1955. ↩
8. Expenses allocated to "Incompleted Deals" actually amount to $1,169,312.07, in which is included $32,006.84, an allocated amount of charitable contributions, which amount exceeded the 5% limitation by $2,347.31. Therefore, the allocated part of charitable contributions was only $29,659.53, and the total expenses allocated to "Incompleted Deals" is $1,166,964.76.
*. Explanations added from Journal vouchers. ↩